# Illinois Official Reports

## Appellate Court

<table>
<tr><td>

***Matthews v. Chicago Transit Authority*, 2014 IL App (1st) 123348**

</td></tr>
</table>

| | |
|---|---|
| Appellate Court Caption | JERRY MATTHEWS; JERRY WILLIAMS; TOMMY SAMS; CYNTHIA BOYNE; and CHARLES BROWN, Individually and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants, v. CHICAGO TRANSIT AUTHORITY; RETIREMENT PLAN FOR CHICAGO TRANSIT AUTHORITY EMPLOYEES; THE BOARD OF TRUSTEES OF THE RETIREMENT PLAN FOR CHICAGO TRANSIT AUTHORITY EMPLOYEES; RETIREE HEALTH CARE TRUST; and THE BOARD OF TRUSTEES OF THE RETIREE HEALTH CARE TRUST, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-3348 |
| Modified opinion filed | April 25, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the dismissal of a class action alleging that defendant transit authority, the Retirement Plan and the Retirement Board for the current and retired employees of the authority diminished plaintiffs' benefits, violated the Illinois Constitution, and breached defendants' fiduciary duties, the dismissal was affirmed in part and reversed in part, since the current employees' claims were properly dismissed due to their lack of standing, but the retired employees stated a cause of action against the Retirement Plan for breach of contract based on their vested right to at least a portion of their benefits and a cause of action for promissory estoppel against the transit authority, and although the retired employees did not state a cause of action for breach of fiduciary duty against the Retirement Board or the Health Trust Board, they did state a cause of action against all defendants for declaratory judgment, and, furthermore, the dismissal of their constitutional claim that the Illinois Constitution protected retiree health care benefits was reversed and the trial court was directed to consider that issue in light of the forthcoming decision of the Illinois Supreme Court in *Kanerva*, a case involving that issue. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-15446; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with instructions. |
| Counsel on Appeal | J. Peter Dowd, Justin J. Lannoye, and George A. Luscombe III, all of Dowd, Bloch & Bennett, of Chicago, for appellants. |
| | Karen Seimetz, Stephen L. Wood, and Michele D. Morris, all of Chicago Transit Authority, of Chicago, for appellee Chicago Transit Authority. |
| | Richard W. Burke and Aaron H. Stanton, both of Burke, Warren, Mackay & Serritella, P.C., of Chicago, for other appellees. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices McBride and Palmer concurred in the judgment and opinion. |

**OPINION**

¶ 1    The instant appeal arises from the dismissal of plaintiffs' class action suit pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-615, 2-619 (West 2010)). Plaintiffs' complaint alleges that defendants substantially diminished and impaired the vested retirement health care benefits of plaintiffs, current and retired employees of defendant Chicago Transit Authority (the CTA). The trial court dismissed the case, finding: (1) that the plaintiffs who were current CTA employees lacked standing; (2) that none of the plaintiffs could state a claim against the CTA because it had no responsibility for retiree health care benefits; and (3) that none of the plaintiffs could state a claim against any of the defendants because plaintiffs did not have a vested right to retiree health care benefits. Plaintiffs appeal, and we affirm in part and reverse in part.

I. Parties

A. Plaintiffs

The individual plaintiffs are current and former employees of the CTA, all of whom began working for the CTA prior to 2001 and all of whom participated in the Retirement Plan for Chicago Transit Authority Employees. Named plaintiffs Jerry Williams, Cynthia Boyne, and Charles Brown are retired, while plaintiffs Jerry Matthews and Tommy Sams were currently employed by the CTA as of April 20, 2011, the filing date of the class action complaint. Both Matthews and Sams are union members: Matthews is a member of Amalgamated Transit Union Local 308 (Local 308) and Sams is a member of Amalgamated Transit Union Local 241 (Local 241).

The class action complaint also sets forth two classes of plaintiffs. Class I consists of CTA employees hired prior to September 5, 2001, who retired before January 1, 2007. Class II consists of CTA employees hired prior to September 5, 2001, who either retired after January 1, 2007, or remain active employees. Each class consists of more than 7,000 people.

B. Defendants

1. The CTA

Defendant CTA is a "political subdivision, body politic and municipal corporation" created in 1945 by the Metropolitan Transit Authority Act (70 ILCS 3605/3 (West 2010)).

2. Retirement Plan Defendants

Defendant Retirement Plan for Chicago Transit Authority Employees is the entity responsible under section 22-101 of the Pension Code (40 ILCS 5/22-101 (West 2010)) for providing specified retirement benefits to retired CTA employees, which are set forth in an agreement entitled "Retirement Plan for Chicago Transit Authority Employees." The terminology is confusing because both the written agreement and the entity have the same name; however, the parties use various labels to attempt to minimize confusion. We will adopt the terminology used by plaintiffs and will refer to the entity as the "Retirement Plan" and the written agreement as the "retirement plan agreement."

Defendant Board of Trustees of the Retirement Plan for Chicago Transit Authority Employees (Retirement Plan Board) was established on January 18, 2008, by section 22-101(b) of the Pension Code (40 ILCS 5/22-101(b) (West 2010)) to administer the Retirement Plan. The Retirement Plan Board is the successor to the Retirement Allowance Committee that administered the Retirement Plan prior to January 18, 2008. While the

---

[1]The facts are taken from the complaint and the exhibits attached thereto, and those documents attached to the motions to dismiss that are public documents of which we may take judicial notice. See *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001) (taking judicial notice of the case file of a previous appeal since it "is a public document, capable of being readily verifiable"); *Young-Gibson v. Board of Education of the City of Chicago*, 2011 IL App (1st) 103804, ¶ 52 (taking judicial notice of board's approval of the 2009 fiscal year budget "because it is a public document containing facts capable of instant and unquestionable demonstration").

Retirement Plan is the entity that is responsible for providing the benefits, as a practical matter, the Retirement Plan Board is the group of individuals that administers those benefits.

### 3. Health Trust Defendants

¶ 14    Defendant Retiree Health Care Trust (Health Trust) was established on January 18, 2008, by section 22-101B(b) of the Pension Code (40 ILCS 5/22-101B(b) (West 2010)) to provide health care benefits to CTA retirees.

¶ 15    Defendant Board of Trustees of the Retiree Health Care Trust (Health Trust Board) was established on January 18, 2008, by section 22-101B(b)(1) of the Pension Code (40 ILCS 5/22-101B(b)(1) (West 2010)) to administer the Health Trust. As with the Retirement Plan, while the Health Trust is the entity that is responsible for providing the benefits, as a practical matter, the Health Trust Board is the group of individuals that administers those benefits.

### II. Complaint

¶ 17    On April 20, 2011, the named plaintiffs filed a nine-count class action complaint against defendants. The focus of the complaint was the fact that, after years of fully paid health care benefits for retired CTA employees, plaintiffs are now being asked to pay for a portion of their health care benefits and are no longer entitled to the same level of health care coverage as active CTA employees. The complaint alleges that these changes occurred as a result of amendments to the Pension Code made by Public Act 95-708 (effective January 18, 2008) (the 2008 Act). The complaint alleges that, in charging class members for their retiree health care benefits, defendants diminished those benefits, which plaintiffs claimed (1) was a breach of defendants' contracts with class members, (2) constituted a violation of the Illinois Constitution, and (3) was a breach of defendants' fiduciary duties to class members.

¶ 18    Counts I and V of the complaint, against all defendants, allege a violation of article XIII, section 5, of the Illinois Constitution based on the claim that the retiree health care benefits constitute an " 'enforceable contractual relation, the benefits of which shall not be diminished or impaired' " (quoting Ill. Const. 1970, art. XIII, § 5).

¶ 19    Counts II and VI of the complaint, against the CTA and the Retirement Plan, are for breach of contract, based on the collective bargaining agreements (CBAs) entered into between the CTA and the unions representing plaintiffs that included the retirees' health care benefits. The complaint alleges that each CBA is a contract and that, by completing their service requirements and fulfilling their employment obligations, the class members performed their obligations under each CBA. The complaint further alleges that the CTA and the Retirement Plan breached the CBAs by (1) requiring class members to pay for a portion of their health care coverage, (2) reducing the level of benefits available, and (3) changing the benefits of already-retired CTA employees in a manner unauthorized by the CBAs.

¶ 20    Counts III and VII of the complaint, against the CTA and the Retirement Plan, allege promissory estoppel. The complaint alleges that the CTA and the Retirement Plan made a number of promises to class members, including: (1) that class members would receive fully-paid retiree health care benefits, (2) that those benefits would be identical to those of active CTA employees, (3) that those benefits would be changed only in a manner prescribed

in a CBA, and (4) that those benefits would not be changed without consideration. The complaint alleges that the class members relied on these promises to their detriment by accepting employment at the CTA, working at the CTA, and retiring from the CTA, and further alleges that their reliance was expected and foreseeable.

¶ 21    Counts IV and VIII of the complaint, against the Retirement Plan Board and the Health Trust Board, allege breach of fiduciary duty. The complaint alleges that both defendants owed the class members fiduciary duties, which were breached, causing injury to the class members.

¶ 22    Count IX of the complaint, against all defendants, seeks a declaratory judgment concerning (1) plaintiffs' right to collective bargaining for wage and benefits levels, including potential payroll-based contributions from the CTA for retiree health care benefits and the right to have equal representation on the Retirement Plan Board and the Health Trust Board; and (2) the Health Trust Board's right to tax active CTA employees and dictate the levels of coverage available for the retiree health care benefit without considering CBAs.

¶ 23    In their prayer for relief, plaintiffs request: (1) a certification of Classes I and II; (2) a declaration that certain parts of the 2008 Act are void and unenforceable because they violate article XIII, section 5 of the Illinois Constitution and the Regional Transportation Authority Act (the RTA Act) (70 ILCS 3615/1.01 *et seq.* (West 2010)); (3) a declaration that a 2007 arbitration award is "null and void" as to plaintiffs because the terms of the arbitration award were not adopted in the 2008 Act; (4) a preliminary and permanent injunction against enforcement of certain parts of the 2008 Act and a requirement that defendants reinstate the rights of the class members as they existed prior to the enactment of the 2008 Act, including the right of retired CTA employees to fully paid health care benefits at the same level as those enjoyed by active CTA employees; and (5) an award of compensatory damages to the class members for breach of contract and breach of fiduciary duty, as well as court costs and attorney fees.

¶ 24                    III. Collective Bargaining Between the CTA and Transit Unions

¶ 25    The CTA employs both union and nonunion employees, including employees belonging to Local 241 and Local 308 (collectively, the transit unions). The transit unions collectively bargain with the CTA regarding employee wages, working conditions, and retirement benefits, as required by the RTA Act. The unions represent the active CTA employees in their respective unions; retired employees are not represented by the transit unions in collective bargaining and cannot vote on proposed CBAs, and cannot participate in arbitration proceedings between the transit unions and the CTA to determine the terms to be included in a new CBA.

¶ 26    The CBAs between the CTA and the transit unions consist of a series of "Wages and Working Conditions Agreements," each of which is subject to periodic renewal and modification through collective bargaining. Two such CBAs are at issue in the case at bar. One, the 2004 CBA, became effective January 1, 2004, and had a term through December 31, 2006. The other, the 2007 CBA, became effective January 1, 2007, and had a term through December 31, 2011; the 2007 CBA was the governing agreement at the time of the filing of this class action complaint.

¶ 27    Several provisions of the 2004 and 2007 CBAs are relevant to the instant case. We set forth summaries of the longer provisions here, and quote them as necessary later. Both CBAs provide that the transit unions are "the sole and exclusive bargaining agents for all of [the CTA's] employees" and article 17 of both CBAs sets forth the procedure for arbitration of disputes.

¶ 28    Section 19.2 of the 2004 CBA provides for modifying the CBA, stating that "[e]ither of the parties hereto shall have the right to open this Agreement for modifications and or additions to be effective January 1, 2007, or any anniversary date thereafter by written notice to the other party sixty (60) days prior to such anniversary date." Section 20.2 of the 2007 CBA has identical language, except that the effective date of modifications was "January 1, 2012, or any anniversary date thereafter."

¶ 29    Additionally, incorporated into each CBA is the retirement plan agreement, a contract concerning retirement benefits that was first agreed to by the CTA and the transit unions in 1949. Both the 2004 and 2007 CBAs provide that the retirement plan agreement is incorporated in full into the CBA "in all respects and for all purposes, including future proposals for revision in the Plan and in the negotiation or arbitration of proposed revisions." The retirement plan agreement also provides that it "is part of the Wage and Working Conditions Agreement between the parties hereto. This Agreement can be changed only in accordance with the provisions of the aforesaid Wage and Working Conditions Agreement."

¶ 30    Finally, while not part of the CBAs, section 22-101(a) of the Pension Code concerns changes to the retirement plan agreement, providing that "[t]he terms, conditions and provisions" of the retirement plan agreement "may be established, amended or modified by agreement" of the CTA and the transit unions. 40 ILCS 5/22-101(a) (West 2010).

¶ 31                    IV. Health Care Benefits Between 1980 and January 18, 2008

¶ 32    Prior to May 16, 1980, the CTA contributed up to $40 per retiree per month toward the retiree's health insurance premium. On May 16, 1980, an arbitration panel chaired by Harry J. Dworkin issued an interest arbitration award[2] (the Dworkin award) that ordered the retirement plan agreement to be amended and stated that, "[e]ffective [upon] the issuance of the Award, the [Chicago Transit] Authority will no longer contribute up to $40.00 per month toward the retiree's Group Hospital Surgical premium." Instead, the award ordered the Retirement Plan to pay up to $60 per month toward the retiree's Group Hospital Surgical premium until January 1, 1981, at which time the Retirement Plan would pay up to $75.

¶ 33    The retiree health care benefit was added to the retirement plan agreement in 1980 as a new section 20.12. Section 20.12(a) of the retirement plan agreement, as amended through December 31, 2003, provides:

> "(a) Effective December 1, 1989, a sum will be paid in an amount sufficient to provide insurance coverage for all retirees under the Group Hospital Surgical Major

---

[2]According to the complaint, "[a] proceeding that relates to terms of the CBA applicable to multiple employees or employees as a group, rather than to a single employee's grievance, is called an 'Interest Arbitration.' "

Medical Plan or the Health Maintenance Organization premium,[3] but said sum shall not exceed the premium cost to the [Retirement] Plan effective for such coverage for a retiree on December 31, 2003. This benefit terminates when the retiree attains age 65."

The complaint alleges that, "[a]lthough Section 20.12 facially purports to cap the amount to be paid out of the Retirement Plan Account for retiree health coverage at the December 31, 2003, level, no cap was ever agreed to by Local 308, and so no cap was ever effective or implemented. Accordingly, from 1980 to July 2009, Transit Union members, employees represented by other unions, and non-union employees hired before September 5, 2001,[4] were provided retiree health care benefits identical to those provided to active employees, and were not charged for this retiree health care benefit."

¶ 34                                    V. 2007 Arbitration Award

¶ 35    In 2006, prior to the December 31, 2006, expiration date of the 2004 CBA, the transit unions and the CTA discussed extension of the CBA and changes to its terms. They were unable to reach an agreement and, in 2007, submitted their dispute to an interest arbitration. On June 27, 2007, an arbitration panel, chaired by Edward Benn, issued an opinion and award (the Benn award), prefaced by the statement that the parties requested an expedited hearing and decision "occasioned by certain proposed legislative action being contemplated by the Illinois government, which is designed to remedy a long standing financial problem with the parties' pension and retiree health and welfare funding. From the evidence and arguments of the parties, it is clear that the parties' Pension Fund and retiree health insurance is in dire financial straits and in desperate need of major additional funding." The Benn award further indicated that "the parties have agreed that the jurisdiction of this panel to issue an arbitration award in this matter is expressly conditioned upon the passage into law of legislation which contains substantially the terms and conditions set forth in the attached Exhibit A. In the event such legislation is not passed into law, this Award shall be void and of no effect whatsoever."

¶ 36    Exhibit A to the award provided for the establishment of a "Retiree Health Care Trust" in a section entitled "Retiree Health Care." This section included governance by seven trustees–three union trustees, three CTA trustees, and "the Auditor General or his designee"–and limited the retiree health plan "to a plan no better than the current Option II-the 90%/70% to Insurance Plan." Exhibit A further provided that $450 million would be deposited in "seed" money to the Retiree Health Care Trust in the form of a pension obligation bond, provided that the transit unions and the CTA complied with certain terms, including: (1) that retired employees contribute up to 45% of the total amount expended under the Retirement Plan for health care; (2) that "the Healthcare Trust shall take sole

_____

[3]According to the complaint, the "Group Hospital Surgical Major Medical Plan or the Health Maintenance Organization" are the health insurance plans available to active CTA employees.

[4]In 2001, the CTA and Local 308 agreed to restrict retiree health care benefits for employees hired after September 5, 2001; the same restriction was imposed on Local 241 following an interest arbitration in 2003. Employees hired after September 5, 2001, are not members of either class of plaintiffs.

responsibility for payment, claims and plan administration effective January 1, 2009"; (3) that current employees contribute to their health care costs through a "payroll tax" equal to 3% of compensation; and (4) that the trustees monitor the Retiree Health Care Trust funding levels and the actuarial present value of projected benefits expected to be paid, and have the discretion to increase or decrease contribution levels and benefit levels, based on the presence of a surplus or deficit.

¶ 37 In a section entitled "Pension," Exhibit A provided for legislation establishing governance by 11 members–five CTA members, five union members, and "the Auditor General or his designee." The last section of Exhibit A indicated that "[a]ll of the above [is] contingent on appropriate Legislative Funding."

¶ 38 The complaint alleges that the retired CTA employees who would be charged for their health care benefits pursuant to the Benn award were not parties to the interest arbitration and were not represented at the interest arbitration.

¶ 39                                   VI. Public Act 95-708

¶ 40 Public Act 95-708, entitled "An Act concerning transportation" (the 2008 Act), became effective on January 18, 2008. As relevant to the instant case, the Act amended section 22-101 of the Pension Code and added section 22-101B. The amended section 22-101 concerned the Retirement Plan and provided for the Retirement Plan Board to be composed of 11 members–5 selected by the CTA Transit Board, 5 selected by the transit unions and a coalition of the CTA's other unions, and 1 "selected by the Regional Transportation Authority Board of Directors." 40 ILCS 5/22-101(b) (West 2008). The trustee from the Regional Transportation Authority (RTA) Board of Directors was further required to "be a professional fiduciary who has experience in the area of collectively bargained pension plans." 40 ILCS 5/22-101(b) (West 2008). Beginning in 2009, if the Retirement Plan Board determined that an increased contribution was required to fund the Retirement Plan, then participating employees had to pay one third of the increased contribution. 40 ILCS 5/22-101(e)(3) (West 2008).

¶ 41 Section 22-101(h) stated that "[t]he changes made by this amendatory Act of the 95th General Assembly, to the extent that they affect the rights or privileges of Authority employees that are currently the subject of collective bargaining, have been agreed to between the authorized representatives of these employees and of the [Chicago Transit] Authority prior to enactment of this amendatory Act, as evidenced by a Memorandum of Understanding between these representatives that will be filed with the Secretary of State Index Department and designated as '95-GA-C05.' " 40 ILCS 5/22-101(h) (West 2008). The "Memorandum of Understanding" provided that "[t]he parties acknowledge that the Legislation, if passed into law, is legislation containing substantially the terms and conditions set forth in Exhibit A to Arbitrator Benn's June 26, 2007 Opinion and Award and the parties' clarifications thereto" and further stated that "[t]he parties further acknowledge their intention that the Legislation not be construed as a diminution of the rights, privileges and benefits under the existing CBAs between them or of Arbitrator Benn's June 26, 2007 Opinion and Award, including but not limited to the parties' exercise of their right to grant ad hoc increases to retirees in accordance with the parties' past practice."

¶ 42    Finally, section 22-101(j) stated that "[n]othing in this amendatory Act of the 95th General Assembly shall impair the rights or privileges of Authority employees under any other law." 40 ILCS 5/22-101(j) (West 2008).

¶ 43    The new section 22-101B, entitled "Health Care Benefits," provided that the CTA "shall take all actions lawfully available to it to separate the funding of health care benefits for retirees and their dependents and survivors from the funding for its retirement system. The Authority shall endeavor to achieve this separation as soon as possible, and in any event no later than July 1, 2009." 40 ILCS 5/22-101B(a) (West 2008). It also established the Health Trust "for the purpose of providing health care benefits to eligible retirees and their dependents and survivors in accordance with the terms and conditions set forth in this Section 22-101B" and provided that the Health Trust "shall be solely responsible for providing health care benefits to eligible retirees and their dependents and survivors by no later than July 1, 2009, but no earlier than January 1, 2009." 40 ILCS 5/22-101B(b) (West 2008).

¶ 44    The new Health Trust Board was to consist of seven members–three selected by the CTA Transit Board, three selected by the transit unions and a coalition of the CTA's other unions, and one "selected by the Regional Transportation Authority Board of Directors." 40 ILCS 5/22-101B(b)(1) (West 2008). The trustee selected by the RTA Board of Directors "shall be a professional fiduciary who has experience in the area of collectively bargained retiree health plans." 40 ILCS 5/22-101B(b)(1) (West 2008).

¶ 45    The new Health Trust Board was to "establish and administer a health care benefit program for eligible retirees and their dependents and survivors," which was "not [to] contain any plan which provides for more than 90% coverage for in-network services or 70% coverage for out-of-network services after any deductible has been paid." 40 ILCS 5/22-101B(b)(2) (West 2008). The Health Trust Board was to "establish and maintain an appropriate funding reserve level" and was to make an annual assessment of the funding levels of the Health Trust, which it reported to the Auditor General. 40 ILCS 5/22-101B(b)(3)(ii) (West 2008). In its report to the Auditor General, the Health Trust Board was to include an assessment of whether the actuarial present value of projected benefits expected to be paid to current and future retirees and their dependents and survivors exceeded or was less than the actuarial present value of projected contributions and trust income; if there was a projected shortfall, the Health Trust Board was to "provide a plan of increases in employee, retiree, dependent, or survivor contribution levels, decreases in benefit levels, or both," which would be implemented if approved by the Auditor General. 40 ILCS 5/22-101B(b)(3)(iii) (West 2008).

¶ 46    Beginning January 1, 2009, "the aggregate amount of retiree, dependent and survivor contributions to the cost of their health care benefits" could not exceed "more than 45% of the total cost of such benefits." 40 ILCS 5/22-101B(b)(5) (West 2008). Additionally, section 22-101B included a requirement that "all employees of the Authority shall contribute to the Retiree Health Care Trust in an amount not less than 3% of compensation." 40 ILCS 5/22-101B(b)(6) (West 2008).

¶ 47    Finally, section 22-101B stated: "No earlier than January 1, 2009 and no later than July 1, 2009 as the Retiree Health Care Trust becomes solely responsible for providing health care benefits to eligible retirees and their dependents and survivors in accordance with subsection (b) of this Section 22-101B, the [Chicago Transit] Authority shall not have any obligation to

provide health care to current or future retirees and their dependents or survivors. Employees, retirees, dependents, and survivors who are required to make contributions to the Retiree Health Care Trust shall make contributions at the level set by the Board of Trustees pursuant to the requirements of this Section 22-101B." 40 ILCS 5/22-101B(b)(7) (West 2008).

¶ 48    The 2008 Act also added section 12c to the Metropolitan Transit Authority Act, which permitted the CTA to issue certain bonds and notes, over $500 million of which was to be deposited into the Health Trust for retiree health care. 70 ILCS 3605/12c(b)(2) (West 2008).

¶ 49                            VII. Health Care Benefits in 2009

¶ 50    Following the enactment of the 2008 Act, on February 27, 2009, the Health Trust Board instituted a health insurance "plan design" that required CTA employees hired prior to September 5, 2001, to pay 45% of the total cost of their retiree health care benefits, and apportioned that cost among the retired CTA employees. The plan design also provided that retired employees would pay more for medical services than active CTA employees, including larger deductibles and copayments than those paid by active CTA employees.

¶ 51    In May 2009, retired CTA employees were sent a letter informing them that, in the future, they would be required to pay part of their monthly health care benefits payment obligations. According to the complaint, "[p]rior to this, CTA employees and retirees had been repeatedly assured that any changes to the Retirement Plan Agreement would affect only new and/or current CTA employees, not employees or retirees hired prior to September 5, 2001." According to the complaint, beginning on July 1, 2009, and continuing each month thereafter, "the CTA, the Retirement Plan, and the Health Trust joined together to compel retire[d] Class Members to pay for health care benefits *** by setting up a mechanism to deduct the improper charges automatically from CTA retirees' monthly pension checks. Class Members were told they had no choice but to authorize such automatic deductions or their retiree health care benefits would end." Also beginning in July 2009, the Health Trust Board began levying a 3% payroll tax on active CTA employees and the complaint alleges that "the Health Trust Board has given indications to CTA employees that it intends to raise this payroll tax in the near future."

¶ 52                            VIII. Motions to Dismiss

¶ 53    Following the filing of plaintiffs' class action complaint, on August 8, 2011, the Retirement Plan, the Retirement Plan Board, the Health Trust, and the Health Trust Board (collectively, the non-CTA defendants) filed a combined motion to dismiss the complaint pursuant to both sections 2-615 and 2-619 of the Code. The non-CTA defendants claimed that the complaint should be dismissed under section 2-615 because (1) the unambiguous language of the retirement plan agreement proves that plaintiffs do not have a vested right to free lifetime retiree health care benefits, so the entire complaint fails; (2) article XIII, section 5, of the Illinois Constitution does not apply to retirement health care benefits but only to pension benefits, so the counts related to the Constitution fail; (3) the CTA and the transit unions had the right to change retiree health care benefits, so the breach of contract claims fail; (4) plaintiffs could not rely on statements outside the retirement plan agreement, so the promissory estoppel claims fail; (5) following the 2008 Act does not constitute a breach of fiduciary duty, so the breach of fiduciary duty claims fail; and (6) since plaintiffs failed to

allege a substantive cause of action, the request for a declaratory judgment fails. The non-CTA defendants further claimed that the complaint should be dismissed under section 2-619 because the transit unions were the only entities that had standing to challenge changes made to retiree health care benefits as a result of the collective bargaining process.

¶ 54    Also on August 8, 2011, the CTA filed a combined motion to dismiss the complaint pursuant to both sections 2-615 and 2-619 of the Code. The CTA claimed that the counts directed at it should be dismissed under section 2-615 (1) because the CTA was not a proper party since it has not had any responsibility to pay any portion of retired CTA employees' health care costs since the 1980s; (2) because plaintiffs did not have a vested right to free health care; and (3) because plaintiffs failed to state a cause of action. The CTA also claimed that plaintiffs do not have standing to challenge their health care benefits.

¶ 55                                IX. Trial Court Ruling

¶ 56    On September 21, 2012, the trial court entered an order granting in part and denying in part defendants' section 2-619 motions and granting defendants' section 2-615 motions in their entirety with prejudice. Concerning the section 2-619 motions, the trial court concluded that the class members who were current CTA employees did not have standing to challenge their health care benefits, since the transit unions were the "sole and exclusive" bargaining agents for current CTA employees under both the 2004 and 2007 CBAs. Additionally, the trial court concluded that, since only a union and an employer may invoke arbitration, only they have the standing to challenge an arbitration award. Consequently, the trial court found that the current CTA employees did not have standing to overturn the Benn award since they did not allege that the transit unions breached their duty of fair representation in the arbitration proceeding. Therefore, the court granted the section 2-619 motions to dismiss with regard to the current CTA employees.

¶ 57    However, the trial court denied the section 2-619 motions to dismiss with respect to the retired CTA employees, finding that the retired employees were not "employees" represented by the transit unions. Additionally, since they were employees at the time the 2004 and 2007 CBAs were negotiated, the trial court found the retired employees in privity with the unions as to those contracts and, therefore, were able to challenge changes to their health care benefits.

¶ 58    Concerning the section 2-615 motions, the trial court granted the motion to dismiss as to the CTA, finding that the Dworkin award, as well as the 2008 Act, established that the CTA did not have any duty to pay for retiree health care benefits.

¶ 59    Additionally, the trial court considered the issue of whether the retiree health care benefits were vested. In its analysis, the trial court considered federal law discussing the vesting of health care benefits. The court noted that the CBAs did not use the term "vest," and found that they did not "clearly and expressly" vest retired CTA employees with fully paid health care benefits after December 31, 2003. The court further observed that, "at most, retirees could expect to have fully paid health insurance but only until December 31, 2003. After that date, Plaintiffs were not entitled to have health insurance premiums paid by the CTA."

¶ 60    The trial court also considered section 17.1 of the retirement plan agreement, which provides:

"[A]n employee retiring under the Plan, desiring that any group health insurance benefit made available for the employee and eligible dependents, by the Authority, in the then existing labor agreement between the parties for active employees, or an employee who immediately prior to retirement was eligible for said benefits made available by any health maintenance organization under contract with the Authority to provide benefits and who desires to continue such benefits upon retirement may authorize the [Retirement Allowance] Committee[5] in writing to deduct monthly from his benefits due under the Plan an amount to pay his monthly premiums or rate."

The court noted that section 17.1 of the retirement plan agreement permitted deductions from retirees' pension checks to pay for premiums and that, "if the CTA and Transit Unions intended to vest retirees with fully paid health insurance to age 65, they certainly would not have included Section 17.1." The court further pointed to portions of the retirement plan agreement in which it provided for vesting of lifetime pension benefits and concluded that the absence of similar language when discussing health care benefits "strongly implies that the parties did not intend to vest retirees with health care benefits." The court also noted that the retirement plan agreement's dissolution provision discussed the payment of "retirement and disability allowances," but not the payment of retiree health care benefits.

¶ 61       Additionally, the trial court concluded that the "more fatal flaw" to plaintiffs' argument was the inclusion of language in the CBAs and the retirement plan agreement that the CTA and the transit unions reserved the right to modify the benefits in collective bargaining. Relying on federal case law, the trial court concluded that health care benefits did not vest in the presence of a reservation of rights clause. Accordingly, the trial court granted the section 2-615 motions to dismiss and declined to address the parties' remaining arguments. This appeal follows.

¶ 62                                                                ANALYSIS

¶ 63       On appeal, plaintiffs claim that the trial court erred in granting the motions to dismiss because (1) they have standing to challenge their retiree health care benefits, (2) they have a vested right to retiree health care benefits, and (3) the CTA bears responsibility for plaintiffs' retiree health care benefits. Additionally, plaintiffs claim that each count of their complaint stated a cause of action for which relief could be granted.

¶ 64                                                      I. Standard of Review

¶ 65       Plaintiffs' claims were dismissed pursuant to sections 2-615 and 2-619 of the Code. A section 2-615 motion to dismiss "tests the legal sufficiency of a complaint," while a section 2-619 motion to dismiss "admits the sufficiency of the complaint, but asserts affirmative matter that defeats the claim." *Bjork v. O'Meara*, 2013 IL 114044, ¶ 21. "In ruling on motions to dismiss pursuant to either section 2-615 or 2-619 of the Code, the trial court must interpret all pleadings in the light most favorable to the nonmoving party" (*Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 23-24 (2004)), and a cause of action should not be dismissed under either section unless it is clearly apparent that no set of facts can be proved

_____

[5]As noted, the Retirement Allowance Committee was the predecessor to the Retirement Plan Board that is a defendant in the instant case.

- 12 -

that would entitle the plaintiff to relief (*Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009) (section 2-615 motion); *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003) (section 2-619 motion)). Our review of a motion to dismiss under either section is *de novo* (*Carr v. Koch*, 2012 IL 113414, ¶ 27), and we may affirm the dismissal of a complaint on any ground that is apparent from the record (*Golf v. Henderson*, 376 Ill. App. 3d 271, 275 (2007)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 66                                    II. Standing

¶ 67    We first address the preliminary question of whether current CTA employees have standing to bring the instant suit. The trial court found that current employees lacked standing for two reasons. First, the court found that the current employees lacked standing because, under the CBAs, the transit unions are the "sole and exclusive" bargaining agents for the employees. Additionally, as to the claims involving the propriety of the Benn award and the portions of the 2008 Act that were derived from the Benn award, the court found that the current employees lacked standing since only parties to the CBA can challenge the arbitration award in court unless the union breached its duty of fair representation, which was not alleged.

¶ 68    On appeal, plaintiffs argue that both of the trial court's conclusions were incorrect and urge us to find that the current CTA employees have standing.[6] First, plaintiffs argue that their claims are based on rights independent of the CBAs, including violations of the Illinois Constitution, promissory estoppel, breach of fiduciary duty, and request a declaratory judgment of their constitutional and statutory rights, and claim that they have the right to prosecute these claims as individuals. Additionally, plaintiffs argue that they have standing to bring their contractual claims because "[t]he grievance procedure in the CBAs here does not cover claims for retirement benefits, which would instead have been referred to the Retirement Allowance Committee for resolution before it was dissolved in 2008," and "[c]learly it would have been futile to file a grievance with the Transit Unions to challenge a statute."

¶ 69    Defendants, in response, argue that the trial court correctly determined that the proper party to raise these claims was the transit unions, and that "[i]f the Current Employees are unhappy with the Unions' conduct, then their course of relief is to file an unfair labor practice charge against the Unions." Defendants point to the fact that the CBAs, the Benn award, and the portion of the 2008 Act based on the Benn award were all implemented as a result of the collective bargaining process and argue that plaintiffs "cannot individually seek to unwind" the collectively bargained-for changes. We agree with defendants.

---

[6]In their petition for rehearing, plaintiffs claim that nonunion employees are not represented by the transit unions and therefore have standing. However, plaintiffs did not argue that CTA employees who are not members of the transit unions are treated differently than union members and, during oral argument, specifically answered:

> "THE COURT: Are [nonunion employees] treated the same way as the union employees?
> PLAINTIFFS' COUNSEL: Yes, Your Honor, they are."

Consequently, we do not address plaintiffs' argument, raised for the first time in their petition for rehearing.

¶ 70    Generally, under both the 2004 and 2007 CBAs, grievances between the CTA and its employees are processed through a three-step procedure. Step 1 requires the grievance to be reported to the CTA "by the Union" and further requires the CTA to provide a written response "to the Union." If the grievance is not resolved "and the Union desires to appeal," the grievance is placed on the agenda for a discussion between the union and representatives of the CTA's employee relations department. If the grievance is still not resolved, "and the Union or the Authority wishes to appeal the grievance, the Union or the Authority may refer the grievance to arbitration." Thus, under the CBAs, it is the union representing the employee that participates in the grievance process, not the employee himself.

¶ 71    Additionally, only parties to an arbitration award may challenge the award in the circuit court, and individual employees represented by a union cannot bring a suit to overturn the outcome of a grievance procedure or arbitration unless the employee proves that the union's conduct in processing the grievance "was arbitrary, discriminatory, or in bad faith." *Stahulak v. City of Chicago*, 184 Ill. 2d 176, 180-81 (1998).

¶ 72    As noted, plaintiffs argue that the current CTA employees have standing to raise their claims because they are asserting individual rights independent of the CBAs. It is true that the claims alleged by plaintiffs are not problems caused by the CTA violating a CBA, as in the typical situation involving grievances. For instance, this is not a case of an employee challenging his termination or her work environment. Instead, plaintiffs allege that the CBA negotiated by the CTA and the transit unions contains terms that violate the Illinois Constitution, the RTA Act, and earlier promises made to plaintiffs. In short, the claims alleged by plaintiffs are claims about the terms of the CBA itself, not about compliance with those terms by the CTA.

¶ 73    We cannot agree with plaintiffs that the nature of their claims confers standing upon the current CTA employees. Despite their contentions, plaintiffs' claims are not seeking "to vindicate individual rights independent of collective bargaining agreements." Each of the "individual rights" alleged by plaintiffs arises from the CBAs. The retiree health care benefits that plaintiffs are seeking to retain are provided by the CBAs and the retirement plan agreement incorporated within them, and the question we are asked to answer is whether the benefits provided by the CBAs may be changed. Indeed, a central issue in the instant case involves interpretation of section 20.12 of the retirement plan agreement and whether it provides for vested retiree health care benefits.

¶ 74    Plaintiffs cite several cases to demonstrate that individual employees can bring claims independent of collective bargaining agreements. For instance, in *Cosentino v. Price*, 136 Ill. App. 3d 490, 494 (1985), the appellate court noted that "[a] cause of action for retaliatory discharge is recognized in Illinois independent of any remedy the employee may have based on a collective bargaining agreement." Similarly, in *Casanova v. City of Chicago*, 342 Ill. App. 3d 80, 89, 91-93 (2003), the appellate court considered the plaintiff's procedural due process claim despite concluding that the plaintiff lacked standing to challenge an arbitration award. Finally, in *City of Rock Island v. Human Rights Comm'n*, 297 Ill. App. 3d 766, 770 (1998), the appellate court found that an employee "has a right to assert a claim of racial discrimination under the Human Rights Act [(775 ILCS 5/1-101 *et seq.* (West 1996))] that is independent of his contractual right under the collective bargaining agreement."

¶ 75    We have no quarrel with plaintiffs' argument that individual employees can bring claims independent of collective bargaining agreements. However, in the case at bar, the claims that

the current CTA employees raise are not independent of the CBAs between the CTA and the transit unions. In the cases cited by plaintiffs, even in the absence of a collective bargaining agreement, the plaintiffs in those cases would have the right to bring causes of action for retaliatory discharge, procedural due process, and racial discrimination. By contrast, here, in the absence of the CBAs and the retirement plan agreement incorporated therein, plaintiffs would have no retiree health care benefits to protect. The benefits originated in the CBAs, they are administered as provided for in the retirement plan agreement, and they were changed by the CBAs. We can find no legal basis to determine that any of the claims alleged concerned the retiree health care benefits independent of the CBAs.

¶ 76    In the case at bar, the trial court correctly determined that the current CTA employees do not have standing to raise their claims. The current CTA employees could have filed an unfair labor practice charge against the transit unions, arguing that the transit unions breached their duty of fair representation (1) in agreeing to a CBA that included terms that could be unconstitutional, violated the RTA Act, and breached promises made to CTA employees; and (2) in not appealing the Benn award, which set forth the terms that were incorporated into the 2007 CBA, and which was the basis for the 2008 Act. Although we are sympathetic to the current CTA employees' plight, we see no way that they have standing to raise their claims.[7]

¶ 77    As a final matter, plaintiffs argue that the grievance procedure provided by the CBAs does not apply to the retirement plan agreement, based on a provision in the retirement plan agreement granting the Retirement Allowance Committee (now the Retirement Plan Board) the power "to decide any questions arising in the administration, interpretation and application of this Plan." However, the retirement plan agreement is expressly part of the CBAs, and the CBAs set forth a detailed grievance process, and we cannot say that the above statement is intended to replace the CBAs' grievance procedure for issues concerning the retirement plan agreement.

¶ 78                                III. Claims Involving the CTA

¶ 79    Next, we consider whether the trial court properly granted the CTA's motion to dismiss since the CTA had no responsibility for the payment of retiree health care benefits. The trial court found that the Dworkin award, as well as the 2008 Act, established that the CTA did not have any duty to pay for retiree health care benefits. On appeal, plaintiffs[8] argue that the complaint alleges facts "that establish the CTA's obligation to provide plaintiffs' retiree health benefits, including access to the group plans for active employees."

¶ 80    As an initial matter, the CTA asks us to strike certain sections of plaintiffs' brief and dismiss plaintiffs' appeal because the sections of plaintiffs' brief concerning the CTA do not contain citations to authority. Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008)

_____

[7]Indeed, our conclusion is bolstered by the fact that, in researching the issues present in the instant case, we have been unable to discover any cases concerning retirement health benefits in which current employees are plaintiffs; instead, plaintiffs are universally either retired employees or unions.

[8]As we have determined that the current CTA employees do not have standing and were properly dismissed, any reference to "plaintiffs" for the remainder of the opinion refers only to the class I plaintiffs remaining.

requires the appellant to support its arguments with citations to authority and a failure to do so may result in forfeiture of the issue on appeal. See *People v. Ward*, 215 Ill. 2d 317, 331-32 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."). However, waiver is an admonition to the parties, not a limitation upon the powers of courts of review. *Flynn v. Ryan*, 199 Ill. 2d 430, 438 n.1 (2002). Here, since plaintiffs' main argument concerning the CTA depends on the meaning of the language of the Dworkin award and the retirement plan agreement, we are able to analyze their argument effectively despite the lack of citations to authorities and choose to do so. Thus, we proceed to consider the issue on its merits.

¶ 81    Plaintiffs argue that the CTA has a "long-standing and continuing obligation[ ] under the CBA for retiree health benefits." They point to the fact that the CTA is the employer signatory to the CBAs, and argue that "[i]t would be contrary to the basic laws of contracts and collective bargaining for the CTA to negotiate an employee benefit and have no responsibility at all for its role in changing the retirement system to negate the benefits that it promised." They also argue that, while the retirement plan agreement provides for payment of retiree health care benefits out of the Retirement Plan's assets, "it does not mandate that the cost of retiree health benefits would be paid exclusively from the Retirement Plan, with no obligation of the CTA." Instead, they claim that the CTA was obligated to pay any costs not covered by the Retirement Plan, and the CTA acted in accordance with this obligation until its breach in 2009. We do not find plaintiffs' argument persuasive.

¶ 82    While we acknowledge that we must take plaintiffs' allegations as true for the purpose of a motion to dismiss, an examination of the Dworkin award and the language of the CBAs leads us to the same conclusion reached by the trial court: that the CTA does not have a contractual or statutory obligation to provide retiree health care benefits. First, the May 16, 1980, Dworkin award ordered the retirement plan agreement to be amended and stated that, "[e]ffective [upon] the issuance of the Award, the [Chicago Transit] Authority will no longer contribute up to $40.00 per month toward the retiree's Group Hospital Surgical premium." Instead, the award ordered the Retirement Plan to pay up to $60 per month toward the retiree's Group Hospital Surgical premium until January 1, 1981, at which time the Retirement Plan would pay up to $75. Thus, as of 1980, the responsibility of paying the retiree health care benefits shifted from the CTA to the Retirement Plan.[9]

¶ 83    Plaintiffs argue that the award was relevant only to the CBA governed by it, and that it does not speak to the issue of whether the CTA is now obligated to pay for retiree health care benefits. Plaintiffs also argue that the Dworkin award only concerned payment of premiums and did not concern the CTA's obligation to provide retired CTA employees with access to the same insurance plans provided to active CTA employees. However, plaintiffs' argument overlooks the language of the CBAs, and the retirement plan agreement incorporated therein.

¶ 84    As plaintiffs admit, the retirement plan agreement provides for payment of retiree health care benefits from Retirement Plan assets. Nevertheless, plaintiffs claim that the retirement plan agreement does not state that those benefits are *exclusively* paid for by the Retirement

---

[9]Plaintiffs clarified during oral argument that class I does not include any retired CTA employees who retired prior to 1980.

Plan, and that the CTA has an obligation to pay the difference between the retired employees' premiums and the amount paid by the Retirement Plan. However, section 7.5 of the retirement plan agreement specifically provides:

> "All payments and benefits provided for in this Plan *** shall be made from the Fund and there shall be no obligation on the part of the Authority or the employees to provide for payments of benefits from any other source; and there shall be no liability on the Authority or employees to make any contributions other than those specified in Paragraph 7.1 and Paragraph 21.1(1) and Paragraph 22.2 hereof."

Thus, under the specific terms of the retirement plan agreement, the CTA has no obligation to make any contributions other than those set forth in the retirement plan agreement.

¶ 85    Plaintiffs make the claim that section 7.5 does not apply to retiree health care benefits, arguing that the "Plan" referred to in the section "is a defined term referring to only the 'retirement and disability allowance plan.' *** It does not include the separate 'Group Hospital Surgical Major Medical Plan or the Health Maintenance Organization premium' in Section 20.12." However, plaintiffs' argument mischaracterizes the definition of "Plan" in section 1.1 of the retirement plan agreement, which states in full:

> "The retirement and disability allowance plan which is the subject of this agreement shall be known as 'RETIREMENT PLAN FOR CHICAGO TRANSIT AUTHORITY EMPLOYEES' and is sometimes referred to in this agreement as 'this Plan' or 'the Plan.' " (Emphasis in original.)

Clearly, the "Plan" is the retirement plan agreement in its entirety, not simply the portions concerning pensions and disability benefits.[10] Were it otherwise, section 20.12 of the retirement plan agreement, which concerns retiree health care benefits, would not contain any references to the "Plan" paying for health care benefits. Accordingly, the terms of the retirement plan agreement contradict plaintiffs' claims that the CTA had an obligation to pay retiree health care benefits.

¶ 86    All is not lost for plaintiffs, however. Although the CTA does not have a contractual or statutory obligation to pay for retiree health care benefits, plaintiffs have alleged that the CTA nevertheless continued to pay for retiree health care until 2009 and, at this early stage of the proceedings, "we accept as true all well-pleaded facts and all reasonably drawn inferences from those facts in favor of the plaintiff." *Doe*, 213 Ill. 2d at 28. As will be explained later in our opinion, plaintiffs' allegations are sufficient to state a cause of action for promissory estoppel and declaratory judgment as we cannot find that it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier*, 207 Ill. 2d at 277-78. Thus, while the trial court correctly granted the CTA's motion to dismiss with respect to the majority of the claims against it, those two counts remain and should not have been dismissed.

---

[10]Sometimes, based on context, the "Plan" is the Retirement Plan as an entity, not the retirement plan agreement as a written contract. Nevertheless, the point remains that the "Plan" is not limited to solely pensions and disability benefits.

¶ 87                          IV. Vesting of Retiree Health Care Benefits

¶ 88        We next turn to the issue of whether the retired CTA employees had a vested right to retiree health care benefits. After dismissing the CTA and finding the current CTA employees lacked standing, the trial court found the issue of vesting dispositive of the rest of plaintiffs' claims. In essence, the trial court concluded that since plaintiffs had no vested right to retiree health care benefits, plaintiffs could not state a cause of action under any of their theories of recovery. The trial court found that the retirement benefits were not vested rights because (1) the language of the retirement plan agreement did not include an intention to vest in "clear and express language," and (2) the retirement plan agreement and the CBAs included language reserving the right to modify the benefits in collective bargaining. On appeal, plaintiffs do not dispute the trial court's conclusion that vesting is a threshold issue, but argue that their rights were vested and, therefore, the trial court erred in granting defendants' motion to dismiss.

¶ 89        Plaintiffs argue that their retiree health care benefits were vested under two theories: (1) the language of the retirement plan agreement itself and (2) the language of article XIII, section 5 of the Illinois Constitution. We first consider plaintiffs' contractual argument and will only consider plaintiffs' constitutional argument if necessary. See *Marconi v. City of Joliet*, 2013 IL App (3d) 110865, ¶ 16 ("we must avoid the adjudication of constitutional questions when a case can be decided on other grounds").

¶ 90                          A. Language of Retirement Plan Agreement
¶ 91                                      1. Presumption

¶ 92        Plaintiffs argue that, under the terms of the retirement plan agreement, their right to retiree health care benefits was vested. In considering the language of the retirement plan agreement, we must first determine whether there is a presumption either in favor of or against vesting of retirement health care benefits. There are two Illinois cases cited by the parties speaking to this issue: *Haake v. Board of Education for Glenbard Township High School District 87*, 399 Ill. App. 3d 121 (2010), a Second District case applying federal law, which, in the Seventh Circuit, includes a presumption against vesting; and *Marconi v. City of Joliet*, 2013 IL App (3d) 110865, a Third District case applying state law and imposing a presumption in favor of vesting.[11]

¶ 93        In *Haake*, the Second District considered whether the defendant school board could reduce the health insurance benefits provided to retired teachers pursuant to CBAs between the school board and the teachers' union, after those CBAs had expired. *Haake*, 399 Ill. App. 3d at 122. In its analysis, the *Haake* court indicated that there was little Illinois case law on point because "federal common law developed under section 301 of the [Labor-Management Relations Act, 1947 (29 U.S.C. § 185 (2000))] is supposed to be applied in any case requiring the interpretation of a collective bargaining agreement." *Haake*, 399 Ill. App. 3d at 127. Thus, the court applied federal law to its analysis. *Haake*, 399 Ill. App. 3d at 128.

¶ 94        The *Haake* court noted that the question was whether the retiree health care benefits had vested, "so that they survive the expiration of the agreement granting them" and further noted

---

[11]*Marconi* had not yet been decided at the time of the trial court's decision in the case at bar. Accordingly, neither the trial court nor the parties relied on the case below. However, the impact of the case has been discussed in the non-CTA defendants' response brief and plaintiffs' reply brief on appeal.

that "[n]o federal statute requires employers to grant health insurance benefits to retirees, and such benefits are vested only if the contract under which they were provided so states." *Haake*, 399 Ill. App. 3d at 131 (citing *Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 783 (7th Cir. 2005)). " '[B]ecause employers are not legally required to vest benefits, the intention to vest must be found in "clear and express language." ' " *Haake*, 399 Ill. App. 3d at 132 (quoting *Bland*, 401 F.3d at 784, quoting *Inter-Modal R. Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 515 (1997)). Under the terms of the contracts before it, the court concluded that the intention to extend the duration of the retiree health care benefits beyond the expiration of the contacts was clearly expressed. *Haake*, 399 Ill. App. 3d at 132.

¶ 95    The *Haake* court rejected the school board's argument that, under Seventh Circuit case law, there is a presumption that retiree health care benefits terminate when the CBA providing for them expires, finding that the presumption applied "only if a collective bargaining agreement is utterly silent on the question of whether the health insurance benefits provided therein were intended to survive the expiration of the collective bargaining agreement." *Haake*, 399 Ill. App. 3d at 132-33 (citing *Bland*, 401 F.3d at 784, and *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544 (7th Cir. 2000)). Since the contracts before it were not silent, "the presumption [was] not applicable." *Haake*, 399 Ill. App. 3d at 133.

¶ 96    Three years later, in *Marconi*, the Third District disagreed with the *Haake* court's conclusion that federal law applied to the interpretation of collective bargaining agreements involving state governments. *Marconi*, 2013 IL App (3d) 110865, ¶ 22. In that case, the plaintiffs, retired firefighters and police officers, sued the City of Joliet, their former employer, in response to the city's decision to reduce some of the retirement health benefits that were promised to them. *Marconi*, 2013 IL App (3d) 110865, ¶ 1. The plaintiffs argued that the changes to their benefits violated article XIII, section 5, of the Illinois Constitution because it diminished the health care benefits to which they were contractually entitled at the time of their retirement. *Marconi*, 2013 IL App (3d) 110865, ¶ 12.

¶ 97    The *Marconi* court first focused on "whether each plaintiff has a vested right to receive the specific health care benefits promised in the collective bargaining agreement under which he retired, thereby barring the City from unilaterally reducing such benefits after his retirement." *Marconi*, 2013 IL App (3d) 110865, ¶ 17. If not, then the plaintiffs' entitlement to the benefits provided in the CBAs expired when the agreements terminated, and no principle of contract law would bar the city from reducing those benefits after the plaintiffs retired. *Marconi*, 2013 IL App (3d) 110865, ¶ 17. Only in the event that the benefits were not vested according to the contract would the court consider whether the city's reduction of the benefits violated the Illinois Constitution. *Marconi*, 2013 IL App (3d) 110865, ¶ 17.

¶ 98    Prior to addressing the merits of the case, the *Marconi* court considered whether federal or state law applied to the plaintiffs' claims, and whether a presumption concerning vesting applied. The *Marconi* court noted that the *Haake* court concluded that federal law applied to claims for breach of a collective bargaining agreement, but disagreed with that conclusion. *Marconi*, 2013 IL App (3d) 110865, ¶ 22. The *Marconi* court noted that, "[a]lthough state-law claims for breach of a collective bargaining agreement by a private employer are generally preempted by federal labor law, the federal act does not apply where the employer is 'any State or political subdivision thereof.' " *Marconi*, 2013 IL App (3d) 110865, ¶ 22 (quoting 29 U.S.C. § 152(2) (2000)). Accordingly, the court concluded that, since the City of

Joliet was a political subdivision of the State of Illinois, "any claim involving the interpretation of the plaintiffs' collective bargaining agreements arises under Illinois law, not federal law." *Marconi*, 2013 IL App (3d) 110865, ¶ 22.

¶ 99 The *Marconi* court then examined whether a presumption should be applied either in favor of or against vesting. The court noted that several courts, including the Seventh Circuit, applied a presumption against the vesting of retirement benefits under a collective bargaining agreement, finding that such benefits vested only if the presumption was rebutted through contractual language or by extrinsic evidence showing that the parties intended the benefits to survive the expiration of the agreement. *Marconi*, 2013 IL App (3d) 110865, ¶ 24 (citing *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993)). However, the court also noted that other courts, namely, the Supreme Court of Wisconsin, applied a presumption in favor of vesting retirement health care benefits. *Marconi*, 2013 IL App (3d) 110865, ¶ 25. The court then engaged in a thorough examination of the Supreme Court of Wisconsin's decision in *Roth v. City of Glendale*, 2000 WI 100, 237 Wis. 2d 173, 614 N.W.2d 467, in which the Wisconsin court "applied a presumption that health benefits promised in a collective bargaining agreement vest unless: (1) the language of the agreement suggests otherwise; or (2) the agreement is ambiguous and extrinsic evidence demonstrates that the parties did not intend the benefits to vest," reasoning that "this presumption 'comports with a more far-reaching understanding of the context in which retiree benefits arise and serves to fulfill the legitimate expectations of employees who have bargained for those benefits.' " *Marconi*, 2013 IL App (3d) 110865, ¶ 26 (quoting *Roth*, 2000 WI 100, ¶ 26, 237 Wis. 2d 173, 614 N.W.2d 467).

¶ 100 The *Roth* court noted that "employers offer employment benefits to attract and maintain personnel, and that '[t]he employer's promise of such benefits is an inducement to provide services for that particular employer to the exclusion of other employment opportunities.' " *Marconi*, 2013 IL App (3d) 110865, ¶ 26 (quoting *Roth*, 2000 WI 100, ¶ 27, 237 Wis. 2d 173, 614 N.W.2d 467). Thus, treating such benefits as mere gratuities that could be changed by the employer after the employee's retirement would frustrate the legitimate expectations of retirees. *Marconi*, 2013 IL App (3d) 110865, ¶ 26.

¶ 101 The *Roth* court also set forth several equitable considerations weighing in favor of a vesting presumption, including "the unfairness of allowing an employer to offer retirement benefits as an inducement to employment and, after an employee has accepted employment under such circumstances and satisfied all the contractual conditions entitling him to such benefits, [allowing the employer to then] disregard or modify its contractual obligations." *Marconi*, 2013 IL App (3d) 110865, ¶ 27. Furthermore, " 'many retirees live solely on their retirement benefits,' and *** '[r]etirees with fixed incomes are generally ill-prepared to meet additional financial obligations that were unanticipated and that may be incrementally modified without notice.' " *Marconi*, 2013 IL App (3d) 110865, ¶ 27 (quoting *Roth*, 2000 WI 100, ¶ 33, 237 Wis. 2d 173, 614 N.W.2d 467). Finally, the *Roth* court noted that unions were not obligated to represent the interests of retired employees during collective bargaining and that bargaining for continued benefits " 'may create conflicts of interest between the retirees and the current union employees,' " and a presumption in favor of vesting thus " 'serves to protect the voiceless in the subsequent negotiating process.' " *Marconi*, 2013 IL App (3d) 110865, ¶ 28 (quoting *Roth*, 2000 WI 100, ¶¶ 35-36, 237 Wis. 2d 173, 614 N.W.2d 467).

¶ 102    The *Marconi* court found *Roth*'s reasoning persuasive, finding:

> "Unless the contractual language or extrinsic evidence clearly shows otherwise, retirement health care benefits promised under a collective bargaining agreement are not mere gratuities that may be unilaterally reduced or eliminated by the employer after an employee has earned them. The promise of health insurance benefits at retirement may induce an employee to accept a job and to work for the requisite number of years in order to become eligible for such benefits. [Citation.] This provides a substantial benefit to the employer. Accordingly, once an employee becomes eligible for health insurance benefits and retires under the agreement, the right to receive the benefits vests, and the employer must provide the benefits as promised in the agreement. [Citations.]" *Marconi*, 2013 IL App (3d) 110865, ¶ 29.

The *Marconi* court further found that fundamental fairness requires a presumption in favor of vesting:

> "When the promise of retirement health benefits induces an employee to work for an employer until he becomes eligible for such benefits, this inducement may prevent him from finding alternative ways to prepare for retirement, either by finding other employment with higher wages or benefits or by negotiating with the employer for higher wages in lieu of retirement benefits so that he can start his own personal retirement account. [Citation.] Such an employee may be put in an untenable position when his employer unilaterally withdraws or diminishes his benefits after the employee has retired. [Citation.] He may be forced to incur a 'substantial financial burden for which [he] had not planned at a time when it is least affordable.'" *Marconi*, 2013 IL App (3d) 110865, ¶ 30 (quoting *Poole v. City of Waterbury*, 831 A.2d 211, 224 (Conn. 2003)).

Finally, the *Marconi* court found that a presumption in favor of vesting "protects retirees from the vagaries of a collective bargaining process that no longer represents their interests," since unions only represented the interests of active employees when negotiating a new collective bargaining agreement, not the interests of employees who had already retired, and, "[a]ccordingly, unions have every incentive to bargain for conditions that would benefit active employees at the expense of retirees." *Marconi*, 2013 IL App (3d) 110865, ¶ 31.

¶ 103    The *Marconi* court rejected the city's argument that the court should not use the vesting presumption applied in *Roth* because "*Roth* announced a policy preference of the Wisconsin Supreme Court that is 'in open opposition to Seventh Circuit jurisprudence.'" *Marconi*, 2013 IL App (3d) 110865, ¶ 36. The *Marconi* court again noted that federal law did not apply to state-law claims for breach of a collective bargaining agreement by a municipal employer. *Marconi*, 2013 IL App (3d) 110865, ¶ 36. Furthermore, the court pointed out that most of the federal cases that apply an inference against vesting of retiree health care benefits addressed claims in which the Employment Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 *et seq.* (2000)) was at issue, and that ERISA requires the vesting of pension rights, but not health or other welfare benefits for retirees, leading some federal courts to conclude that a presumption against the vesting of retirement health care benefits is appropriate; since ERISA did not apply to government-sponsored and government-funded benefit plans, any inference against vesting implied by ERISA had no application. *Marconi*, 2013 IL App (3d) 110865, ¶ 36. Finally, the *Marconi* court noted that, even within the federal courts, not all courts followed the Seventh Circuit's presumption against the vesting

- 21 -

of retirement health care benefits. *Marconi*, 2013 IL App (3d) 110865, ¶ 37. See, *e.g.*, *International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983) (finding that when the parties contract for benefits that accrue upon achievement of retiree status, "there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree"). Accordingly, the *Marconi* court stated:

> "[W]e rule that the plaintiffs' collective bargaining agreements should be interpreted in light of a presumption in favor of the vesting of retirement health care benefits, as in *Roth*. We will therefore presume that such benefits vest unless: (1) the language of the collective bargaining agreements unambiguously suggests otherwise; or (2) if the contract language is ambiguous, extrinsic evidence suggests that the parties did not intend the benefits to vest." *Marconi*, 2013 IL App (3d) 110865, ¶ 38.

¶ 104    In the case at bar, we find *Marconi*'s reasoning persuasive. Accordingly, in our examination of the terms of the CBAs and retirement plan agreement, we will apply a presumption in favor of vesting.

¶ 105                                    2. Contractual Terms

¶ 106    We now turn to the consideration of whether the terms of the CBAs and the retirement plan agreement provided for vested retiree health care benefits. The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004). " '[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). A court interpreting a contract begins by examining the language of the contract alone, and "[i]f the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety*, 185 Ill. 2d at 462 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991)). If an ambiguity is present, then the court may admit parol evidence to aid in resolving the ambiguity. *Air Safety*, 185 Ill. 2d at 462-63 (citing *Whitlock*, 144 Ill. 2d at 447). "In interpreting a contract, it is presumed that all provisions were intended for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Shorr Paper Products, Inc. v. Aurora Elevator, Inc.*, 198 Ill. App. 3d 9, 13 (1990). Additionally, in interpreting the retirement plan agreement, "unless the language of the collective bargaining agreements or extrinsic evidence shows that the parties did not intend the health benefits at issue to vest, we will presume that the parties intended these benefits to survive the expiration of the collective bargaining agreements." *Marconi*, 2013 IL App (3d) 110865, ¶ 40.

¶ 107                            a. Section 20.12 of the Retirement Plan Agreement

¶ 108        In the case at bar, we cannot find that the language of the retirement plan agreement unambiguously provides that retiree health care benefits were not intended to be vested rights. Under section 20.12 of the retirement plan agreement:

> "(a) Effective December 1, 1989, a sum will be paid in an amount sufficient to provide insurance coverage for all retirees under the Group Hospital Surgical Major Medical Plan or the Health Maintenance Organization premium, but said sum shall not exceed the premium cost to the [Retirement] Plan effective for such coverage for a retiree on December 31, 2003. This benefit terminates when the retiree attains age 65."

This section expressly provides that "[t]his benefit terminates when the retiree attains age 65," indicating that the benefit is intended to continue past the expiration of the CBA in force when the CTA employee retires.[12] *Haake*, 399 Ill. App. 3d at 132 (finding that a provision stating that "benefits would be paid until the retiree reached the age of 65" "clearly expressed the intent that the duration of the retiree health insurance benefits was to extend beyond the expiration of the contracts"). Accordingly, the rights provided under section 20.12 are vested rights that may not be changed after the CTA employee retires.

¶ 109        We note that, while section 20.12 appears to cap the level of payments to the premium costs as of December 31, 2003, plaintiffs allege in their complaint that, in actuality, "from 1980 to July 2009, Transit Union members, employees represented by other unions, and non-union employees hired before September 5, 2001, were provided retiree health care benefits identical to those provided to active employees, and were not charged for this retiree health care benefit." For the purposes of a section 2-615 motion to dismiss, all well-pleaded facts in the complaint, and all reasonable inferences that may be drawn from those facts, are taken as true. *Young v. Bryco Arms*, 213 Ill. 2d 433, 441 (2004). Additionally, even if the precise contours of the benefit are in dispute, the retirement plan agreement is clear that, at the very least, benefits up to the level of the December 31, 2003, amount were intended to be vested rights. Whether benefits beyond that level were vested is a question of fact dependent on the course of conduct between the parties and is inappropriate for resolution on a motion to dismiss.

¶ 110                                        b. Other Provisions

¶ 111        Defendants point to several other portions of the retirement plan agreement and CBAs that they claim demonstrate that the CTA and the transit unions did not intend to provide plaintiffs with a vested right to retiree health care benefits. Under section 17.1 of the retirement plan agreement:

> "[A]n employee retiring under the Plan, desiring that any group health insurance benefit made available for the employee and eligible dependents, by the Authority, in the then existing labor agreement between the parties for active employees, or an employee who immediately prior to retirement was eligible for said benefits made available by any health maintenance organization under contract with the Authority to

---

[12]As noted, the retirement plan agreement is a separate document from the CBAs, but is expressly incorporated into the CBAs.

provide benefits and who desires to continue such benefits upon retirement may authorize the [Retirement Allowance] Committee in writing to deduct monthly from his benefits due under the Plan an amount to pay his monthly premiums or rate."

Defendants argue that, "[i]f the CTA and Unions intended to vest Retirees with 'fully paid' health insurance to age 65, then they would not have included Section 17.1 allowing the [Retirement] Plan to deduct money from Retirees' pension checks to pay for health insurance premiums." However, under the terms of the retirement plan agreement, CTA employees hired as of September 5, 2001, did not receive retiree health care benefits, nor did dependents of CTA employees. Thus, the provision for deducting money from retired CTA employees' pension checks is not inconsistent with an intention to vest benefits provided under section 20.12.

¶ 112    Defendants also point to sections 8 and 11 of the retirement plan agreement, which expressly provide for vesting of lifetime pension benefits, and section 21, which concerns distribution of funds in the event of abandonment of the Retirement Plan. Section 8.1 provides that a retiring employee "shall receive an annual retirement allowance paid in equal monthly installments for life" according to the formula set forth in the retirement plan agreement, while section 11 expressly concerns payment of a "deferred vested old-age retirement allowance." Defendants claim that the fact that the retirement plan agreement specifically uses the terms "vested" and "for life" when referring to pension benefits means that the absence of such language when referring to retiree health care benefits demonstrates an intention not to vest, as does the fact that section 21 discusses only payment of pension benefits and not health care benefits upon abandonment of the Retirement Plan. We do not find this argument persuasive.

¶ 113    As noted, although the health care benefits are not provided "for life," section 20.12 expressly indicates that the benefits "terminate[ ] when the retiree attains age 65," indicating that the benefit is contemplated to extend past the expiration of the CBA. The fact that pension benefits extend for a longer period of time than health care benefits does not mean that the right to health care benefits is not a vested one. The same reasoning applies to payments made upon abandonment of the Retirement Plan. Additionally, the scenario at issue in section 11 is the situation in which an employee "becomes separated from the service of the Authority (other than by death) after he has completed ten (10) or more years of continuous service and prior to his eligibility for a retirement allowance"; it is entirely reasonable for the retirement plan agreement to make clear that such an employee is entitled to a deferred vested retirement allowance. Such language is not inconsistent with an intention that other benefits in the retirement plan agreement are also vested rights.

¶ 114                         c. Presence of Reservation of Rights Clause

¶ 115    Finally, we are not persuaded by defendants' argument that the CBAs contain a reservation of rights clause, preventing the benefits from vesting as a matter of law. Defendants' argument relies on several provisions of the retirement plan agreement and 2004 and 2007 CBAs. First, section 19.2 of the 2004 CBA provides for modifying the CBA, stating that "[e]ither of the parties hereto shall have the right to open this Agreement for modifications and or additions to be effective January 1, 2007, or any anniversary date thereafter by written notice to the other party sixty (60) days prior to such anniversary date." Section 20.2 of the 2007 CBA has identical language, except that the effective date of

- 24 -

modifications was "January 1, 2012, or any anniversary date thereafter." Both the 2004 and 2007 CBAs also provide that the retirement plan agreement is incorporated in full into the CBA "in all respects and for all purposes, including future proposals for revision in the Plan and in the negotiation or arbitration of proposed revisions." Finally, the retirement plan agreement provides that it "is part of the Wage and Working Conditions Agreement between the parties hereto. This Agreement can be changed only in accordance with the provisions of the aforesaid Wage and Working Conditions Agreement." Defendants argue that the language in these provisions reserve the right of the CTA and the transit unions to modify retirement benefits.

¶ 116     Defendants rely on federal case law, as did the trial court. While, as noted, state and not federal law applies to the instant case, the federal cases are nonetheless helpful in interpretation of reservation of rights clauses. Both the trial court and defendants cite the Seventh Circuit case of *International Union of United Automobile, Aerospace & Agricultural Implements Workers of America v. Rockford Powertrain, Inc.*, 350 F.3d 698 (7th Cir. 2003), in support of a finding that a reservation of rights clause prevented benefits from vesting in the instant case. In *Rockford Powertrain*, the court determined that the plaintiff retired employees did not have a vested right to retirement health benefits based on two clauses in the collective bargaining agreements between the employees' union and their employer. *Rockford Powertrain*, 350 F.3d at 703. The plaintiffs pointed to a "lifetime benefits clause," which provided that " 'health coverage is continued until ... death ... [i]f you die after retirement, health coverage may be continued for your spouse,' " arguing that this section unambiguously vested them with lifetime health care benefits. *Rockford Powertrain*, 350 F.3d at 703. The court noted that "[t]he plaintiffs' interpretation, however, ignores two equally important clauses contained in the plan description." *Rockford Powertrain*, 350 F.3d at 703. First, the lifetime benefits clause was followed by a "plan termination clause" that provided that, " 'in the event this group plan is terminated, [health insurance] coverage for you and your dependents will end immediately.' " *Rockford Powertrain*, 350 F.3d at 703. Additionally, a "reservation of rights clause" provided the defendant employer's "reservation of its right to modify benefits, found in the 'Future of the Plans' section of the plan description: '[a]lthough the company expects and intends to continue the plan indefinitely, it reserves the right to modify, amend, suspend or terminate them at any time.' " *Rockford Powertrain*, 350 F.3d at 703.

¶ 117     The court sought to resolve the tension between the lifetime benefits clause and the plan termination and reservation of rights clauses, and determined that, reading the plan documents in their entirety, "the clauses explain that although the plan in its current iteration entitles retirees to health coverage for the duration of their lives and the lives of their eligible surviving spouses, the terms of the plan–including the plan's continued existence–are subject to change at the will of [Rockford Powertrain]." *Rockford Powertrain*, 350 F.3d at 703. Thus, the court concluded that "[t]he health insurance section of the plan description unambiguously does not provide the plaintiffs with vested lifetime health insurance benefits" and further noted that "[t]here is no ambiguity in a plan description that states that retirees are currently entitled to life insurance benefits, but also that these benefits are subject to change." *Rockford Powertrain*, 350 F.3d at 704.

¶ 118     We find no analogous reservation of rights clauses in the case at bar. In *Rockford Powertrain*, the two clauses provided that " 'coverage for you and your dependents will end

immediately' " upon termination of the plan and that the company specifically " 'reserves the right to modify, amend, suspend or terminate them at any time.' " *Rockford Powertrain*, 350 F.3d at 703. By contrast, none of the provisions defendants point to include any indication that they have the right to suspend or terminate the retirement health care benefits, only that the provisions of the retirement plan agreement "can be changed only in accordance with the provisions of the aforesaid Wage and Working Conditions Agreement."

¶ 119    We must also note that defendants' brief misrepresents the holding of *Rockford Powertrain* in stating that the case "held that the following provision in a collective bargaining agreement, which was incorporated into the retirement plan, unambiguously provided for reservation of rights: 'this Agreement may be amended or modified in writing by mutual agreement' " (emphasis omitted) (quoting *Rockford Powertrain*, 350 F.3d at 704). The reservation of rights clause relied upon by the *Rockford Powertrain* court is as quoted above in our discussion of the case. The language quoted by defendants is referred to as the "bargaining provision" by the Seventh Circuit and is discussed in the context of the plaintiffs' argument that their benefits could not be unilaterally modified during the term of the collective bargaining agreement. *Rockford Powertrain*, 350 F.3d at 704-05. The Seventh Circuit did not discuss this provision in its analysis of reservations of rights. Thus, the similarity of that language to language present in the CBAs in the instant case does not support defendants' argument concerning a reservation of rights clause.

¶ 120    Similarly, *Pabst Brewing Co. v. Corrao*, 161 F.3d 434 (7th Cir. 1998), does not support defendants' position since it did not consider the presence of a reservation of rights clause. Instead, it focused on the existence of the phrase " 'for the term of this Agreement' " in finding that retirement health care benefits were not vested rights. *Pabst*, 161 F.3d at 441; see also *Pabst*, 161 F.3d at 443 (Ripple, J., dissenting) (noting that "[t]he majority places a great deal of emphasis on the clause '[f]or the term of this Agreement' "); *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544 (7th Cir. 2000) (noting that " 'during the term of this agreement' " was "the formula that we held in [*Corrao*] eliminated any patent ambiguity"). *Rossetto* likewise did not consider the presence of a reservation of rights clause and, in fact, found that the contract was ambiguous, in part because of the lack of the phrase present in *Corrao*. *Rossetto*, 217 F.3d at 545-46.

¶ 121    Finally, *United Mine Workers v. Brushy Creek Coal Co.*, 505 F.3d 764 (7th Cir. 2007), is not persuasive because the language there, like in *Rockford Powertrain*, expressly contemplates termination of the benefits. There, while the plaintiffs were entitled to health benefits " 'for life,' " the health plan "expressly entitle[d] Brushy to terminate it or alter its terms, 'subject to the Collective Bargaining Agreement.' " *United Mine Workers*, 505 F.3d at 766. Additionally, a clause in the collective bargaining agreement provided that " 'the benefits and benefit levels provided by an Employer under its Employer plan are established for the term of this Agreement only,' " which the Seventh Circuit noted "reinforces the right of termination or alteration that the health plan confers on Brushy; it makes the benefits terminate when the agreement expires."[13] *United Mine Workers*, 505 F.3d at 766-67. As

---

[13]The clause had a second part, providing that the benefits " 'may be jointly amended or modified in any manner at any time after the expiration or termination of this agreement,' " but the Seventh Circuit "disregarded" this portion of the clause to eliminate the inconsistency between the " 'jointly

noted, nothing in the agreements in the case at bar states that the CTA or transit unions may terminate the retiree health care benefits, nor was there any language expressly limiting the benefits to the term of the CBA.

¶ 122 In short, in the case at bar, defendants have provided no cases demonstrating that language similar to that present in the CBAs has been considered to be a reservation of rights clause that prevents vesting of contractual rights. The most analogous cases nevertheless include much stronger language, including a right of termination. Moreover, even in *Rockford Powertrain*, where the contract included a provision that " 'this Agreement may be amended or modified ... in writing by mutual agreement' " (*Rockford Powertrain*, 350 F.3d at 704), the court did not consider that language in its reservation of rights analysis, indicating that the court did not consider that provision as defeating vesting. Accordingly, we cannot agree with defendants that the CBAs contain a reservation of rights clause, defeating the presumption that the right to retiree health care benefits was a vested one, and instead find that plaintiffs have a vested right to retiree health care benefits.

¶ 123                      B. Constitutional Argument

¶ 124 Plaintiffs also argue that their retiree health care benefits were vested under the language of article XIII, section 5, of the Illinois Constitution. Since we have determined that their rights were vested pursuant to the language of the CBAs and the retirement plan agreement incorporated therein, we have no need to consider whether the Illinois Constitution also provides them with a vested right. See *Marconi*, 2013 IL App (3d) 110865, ¶ 16 ("we must avoid the adjudication of constitutional questions when a case can be decided on other grounds").

¶ 125                      V. Other Bases for Affirming

¶ 126 Since we have determined that the trial court erred in granting defendants' motion to dismiss on the basis that plaintiffs had no vested right to retiree health care benefits, we must now consider the allegations of plaintiffs' complaint to determine if there is any other basis for affirming the trial court's decision. *Golf*, 376 Ill. App. 3d at 275 (we may affirm the dismissal of a complaint on any ground that is apparent from the record). In their motion to dismiss, defendants also raised the following arguments as bases for dismissal: (1) article XIII, section 5, of the Illinois Constitution does not apply to health care benefits but only to pension benefits; and (2) plaintiffs failed to state a cause of action for breach of contract, promissory estoppel, breach of fiduciary duty, or declaratory judgment. We consider each argument in turn.

¶ 127                         A. Constitutional Claim

¶ 128 The issue of whether the Illinois Constitution protects retired CTA employees' retiree health care benefits or is limited to pension benefits was not decided by the trial court, as its decision was based on its conclusion that plaintiffs had no vested right to retiree health care benefits. A similar constitutional issue is currently pending before our supreme court, and its

---

amended' " clause and the termination provision in the health plan. *United Mine Workers*, 505 F.3d at 766-67.

decision in that case will be instructive in providing an answer. See *Kanerva v. Weems*, No. 115811 (advisement docket, January Term 2014). Given that we are reversing the dismissal of several counts of plaintiffs' complaint and, therefore, the case will be before the trial court again regardless of our conclusion on the constitutional issue, we reverse the dismissal of the constitutional claim so that the trial court can consider it in light of the supreme court's forthcoming decision.

¶ 129                                    B. Breach of Contract

¶ 130    Next we consider whether plaintiffs have stated a claim for breach of contract. To prevail on a breach of contract claim, a plaintiff must plead and prove: (1) that a contract existed, (2) that the plaintiff performed his obligations under the contract, (3) that the defendant breached the contract, and (4) that the plaintiff sustained damages as a result of the defendant's breach. *Anderson v. Kohler*, 397 Ill. App. 3d 773, 785 (2009). In the case at bar, plaintiffs allege that each CBA is a binding and enforceable contract; that by completing their service requirements and fulfilling their employment obligations, the retired CTA employees performed their obligations under each CBA; that all conditions precedent to defendants' contractual obligations have been satisfied; and that defendants breached each CBA, causing damage to plaintiffs by (1) requiring retired CTA employees to pay for retiree health care benefits, (2) reducing the benefits, (3) changing the benefits in a manner unauthorized by the CBA, and (4) effecting these changes without consideration in exchange.

¶ 131    Since we have concluded that plaintiffs have a vested right to at least some portion of their retiree health care benefits, and since plaintiffs have pleaded each element of the cause of action for breach of contract, they have sufficiently stated a claim for breach of contract.

¶ 132                                    C. Promissory Estoppel

¶ 133    We next consider whether plaintiffs have stated a claim for promissory estoppel. In the case at bar, plaintiffs allege that defendants made a number of promises to plaintiffs, notably, that they would receive fully paid health care benefits, that those benefits would be identical to those enjoyed by active CTA employees, that their benefits would only be changed by a method prescribed in a CBA, and that their benefits would not be changed without consideration received in exchange. They further allege that they relied on these promises to their detriment by accepting employment at the CTA, working at the CTA, and retiring from the CTA, and that their reliance was expected and foreseeable. In considering plaintiffs' claims, we consider the non-CTA defendants and the CTA separately.

¶ 134    Generally, in order to establish a claim for promissory estoppel, a plaintiff must plead and prove that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009) (citing *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 309-10 (1990)).

¶ 135    " '[P]romissory estoppel is a doctrine under which the plaintiff may recover without the presence of a contract.' " *Newton*, 233 Ill. 2d at 53 (quoting *Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co.*, 90 Ill. App. 3d 768, 770 (1980)). Thus, a party will generally be barred from seeking redress under the doctrine of promissory estoppel "where the

performance which is said to satisfy the requirement of detrimental reliance is the same performance which supplies the consideration for [a] contract." *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 512 (1995). This is so because promissory estoppel is intended to enforce promises that are not supported by consideration; "[i]t is not intended 'to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract.' " (Internal quotation marks omitted.) *Prentice*, 271 Ill. App. 3d at 512 (quoting *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d 224, 237 (1992)). While a party may plead claims for both breach of contract and promissory estoppel in the alternative, "once it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel." *Prentice,* 271 Ill. App. 3d at 512.

¶ 136   In the case at bar, plaintiffs' promissory estoppel claim against the Retirement Plan was properly dismissed. There is no dispute that the CBAs were in existence, and the CBAs governed the retiree health care benefits at issue in the case at bar through the retirement plan agreement incorporated therein. Since there is no dispute as to the existence of a contract, but only as to the meaning of the terms set forth therein, plaintiffs' promissory estoppel claim must fail. See *Prentice*, 271 Ill. App. 3d at 513 n.2 ("It is, of course, irrelevant whether plaintiffs will ultimately prove a breach of the contract since it is the existence of consideration and not the existence of a breach which precludes reliance on the theory of promissory estoppel.").

¶ 137   With regard to the CTA, however, our analysis is slightly different since the CTA is a municipal corporation. 70 ILCS 3605/3 (West 2010). Although not raised by either party, "the doctrine of promissory estoppel is inapplicable to the [government] absent 'extraordinary circumstances.' " *Hamwi v. Zollar*, 299 Ill. App. 3d 1088, 1096 (1998) (quoting *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 449 (1966)). " 'For a municipality to be estopped, there must have occurred an affirmative act on the part of the municipality which induced substantial reliance thereon by the litigant ***.' " *LaBolle v. Metropolitan Sanitary District*, 253 Ill. App. 3d 269, 275 (1992) (quoting *Diakonian Society v. City of Chicago Zoning Board of Appeals*, 63 Ill. App. 3d 823, 828 (1978)). Additionally, " 'such act must be the act of the municipality itself (such as legislation by a city council) rather than merely the unauthorized act of a ministerial officer or a ministerial representation.' " *LaBolle*, 253 Ill. App. 3d at 275 (quoting *Diakonian Society*, 63 Ill. App. 3d at 828). " 'If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it.' " *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33 (quoting *Stahelin v. Board of Education, School District No. 4*, 87 Ill. App. 2d 28, 39 (1967)).[14]

---

[14]We do not apply this standard to the Retirement Plan, as it is not clear that it would be considered a governmental body. See *Barry v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 357 Ill. App. 3d 749, 779-80 (2005) (concluding that the defendant board was not a "governmental entity" for purposes of statutory interest, since neither it nor the fund it administered performed a governmental function).

¶ 138    In the case at bar, as noted, the CTA's motion to dismiss was granted on the basis that the CTA did not have an obligation to provide health care benefits under the CBAs and the retirement plan agreement, and we have found above that the CTA does not have a statutory or contractual obligation to provide retiree health care benefits. However, plaintiffs have alleged that the CTA continued to pay for health care benefits of retired CTA employees until 2009, and we must take such statements as true for purposes of a motion to dismiss. If there was no contract obligating the CTA to pay for retiree health care benefits, then the issue becomes whether it was obligated through its conduct to continue the payments. This is an area in which promissory estoppel may apply. Plaintiffs have alleged that the CTA made unambiguous promises to plaintiffs, that plaintiffs relied on those promises to their detriment, and that their reliance was expected and foreseeable by the CTA. At this early stage of the proceedings, we cannot find that it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier*, 207 Ill. 2d at 277-78. Accordingly, plaintiffs have sufficiently stated a cause of action for promissory estoppel against the CTA.

¶ 139                              D. Breach of Fiduciary Duty

¶ 140    Next, we consider whether plaintiffs have stated a claim for breach of fiduciary duty. To state a cause of action for breach of a fiduciary duty, a plaintiff must allege and ultimately prove: (1) a fiduciary duty on the part of the defendant; (2) a breach of that duty; (3) damages; and (4) a proximate cause between the breach and the damages. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 53 (1994); *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 747 (2009). In the case at bar, plaintiffs allege that the Retirement Plan Board and the Health Trust Board owed plaintiffs fiduciary duties to act solely in their best interest as participants in and beneficiaries of the Retirement Plan and the Health Trust, pursuant to section 1-109 of the Pension Code (40 ILCS 5/1-109 (West 2008)), and that they breached those duties through choosing to charge retired CTA employees the maximum retiree contribution and withholding the contribution from their pension checks.

¶ 141    Under the Pension Code:

"A person is a 'fiduciary' with respect to a pension fund or retirement system established under this Code to the extent that the person:

(1) exercises any discretionary authority or discretionary control respecting management of the pension fund or retirement system, or exercises any authority or control respecting management or disposition of its assets; [or]
        ***
(3) has any discretionary authority or discretionary responsibility in the administration of the pension fund or retirement system." 40 ILCS 5/1-1.02 (West 2008).

Further:

"A fiduciary with respect to a retirement system or pension fund established under this Code shall discharge his or her duties with respect to the retirement system or pension fund solely in the interest of the participants and beneficiaries and:

(a) For the exclusive purpose of:

(1) Providing benefits to participants and their beneficiaries; and

- 30 -

(2) Defraying reasonable expenses of administering the retirement system or pension fund;

(b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims;

(c) By diversifying the investments of the retirement system or pension fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(d) In accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund." 40 ILCS 5/1-109 (West 2008).

Thus, we must first determine whether plaintiffs have alleged facts indicating that the Retirement Plan Board and the Health Trust Board were fiduciaries and, if so, that they breached their duties as fiduciaries to act solely in the interest of the participants and beneficiaries.

¶ 142    First, we consider whether the Retirement Plan Board and the Health Trust Board were acting in a fiduciary capacity when (1) the Health Trust Board chose to charge retired CTA employees the maximum retiree contribution for their health care benefits; and (2) the Retirement Plan Board stopped paying for retiree health care and began withholding retiree contributions from retired CTA employees' pension checks. As noted, under the Pension Code, in order for either defendant to be considered a fiduciary, it must have been exercising discretionary authority in the administration or management of the Retirement Plan or Health Trust, respectively. 40 ILCS 5/1-1.02 (West 2008).

¶ 143    In considering whether a fiduciary under the Pension Code has breached its fiduciary duty, our courts have looked for instruction to federal law interpreting analogous provisions of ERISA. *Board of Trustees of the Village of Barrington Police Pension Fund v. Department of Insurance*, 211 Ill. App. 3d 698, 705 (1991). The United States Supreme Court has indicated that, under ERISA, "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. *** '[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.' [Citation.] When employers undertake those actions, they do not act as fiduciaries, [citation], but are analogous to the settlors of a trust [citation]." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)). "In general, an employer's decision to amend a pension plan[15] concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999). Thus, "[t]he jurisprudence of this area is marked by the drawing of a sharp distinction between 1) the sponsors of a plan acting as an administrator (which is discretionary and therefore fiduciary) and 2) the sponsors of a plan amending, altering, terminating, or otherwise redesigning the plan itself (functions considered to be not discretionary and therefore not fiduciary)." *Walling v. Brady*, 125 F.3d 114, 119 (3d Cir. 1997). " 'Discretion' for the purpose of determining the applicability of fiduciary obligations means solely that the plan administrator is making a choice reserved to it by the plan

---

[15]The Supreme Court has stated that the fiduciary-settlor distinction applies to both pension and welfare plans in the same way. *Spink*, 517 U.S. at 890-91.

document in administering the plan, not tinkering with the plan document itself." *Walling*, 125 F.3d at 119-20.

¶ 144 In the case at bar, plaintiffs argue that the Health Trust Board owed fiduciary duties to plaintiffs when exercising the discretion afforded to it under section 22-101B of the Pension Code, which provides that the Health Trust Board "shall have the discretion to provide different contribution levels for retirees, dependents and survivors based on their years of service, level of coverage or Medicare eligibility, provided that the total contribution from all retirees, dependents, and survivors shall be not more than 45% of the total cost of such benefits." 40 ILCS 5/22-101B(b)(5) (West 2008). Defendants, on the other hand, argue that in setting contribution levels, the Health Trust Board was not acting as a fiduciary but was merely acting as a settlor. We agree with plaintiffs.

¶ 145 Plaintiffs rely on *Tourangeau v. Uniroyal, Inc.*, 189 F.R.D. 42 (D. Conn. 1999), a district court case from the District of Connecticut. There, the district court held that the act of raising premium rates for lifetime medical, drug, and life insurance benefits was a fiduciary act. *Tourangeau*, 189 F.R.D at 46. The court acknowledged that "[i]t is well settled that an employer or sponsor organization does not act as a fiduciary when it amends, modifies, terminates or changes benefits in an existing ERISA plan. *** Only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration does a person become a fiduciary." *Tourangeau*, 189 F.R.D. at 46. However, the court found:

"The real issue here is whether the act of increasing contribution rates was an amendment, modification or change in benefits to the ERISA plan. Logic and recent case law supports the conclusion that the act was not an amendment, but rather was a discretionary act carried out in accordance with an existing plan provision which provided for rate changes 'in accordance with plan experience and medical cost escalation.' Because the act of changing contribution rates was a valid exercise of an existing provision in the [ERISA] plan that authorized such changes, it did not constitute a plan amendment or modification." *Tourangeau*, 189 F.R.D. at 46.

¶ 146 Similarly, other courts have determined that, when making a decision permitted by the plan and not altering the terms of the plan itself, the plan administrator is acting as a fiduciary and not as a settlor. See, *e.g.*, *Abbott v. Pipefitters Local Union No. 522 Hospital, Medical, & Life Benefit Plan*, 94 F.3d 236, 240 (6th Cir. 1996) (finding that changing a multi-employer welfare benefit plan to require different contribution levels from different unions was a fiduciary function, since "the decision at issue was not one which affected plan design or which altered any existing plan terms. Rather, the decision was an administrative one, squarely within the powers of the trustees to make, but one which did not 'modify' or 'amend' the plan."). We find the cases cited by defendants to be inapposite, since they contained changes that were clearly amendments and not the exercise of discretion explicitly granted to the trustees. *Milwaukee Area Joint Apprenticeship Training Committee for the Electrical Industry v. Howell*, 67 F.3d 1333, 1338 (7th Cir. 1995) (finding that the adoption of a scholarship loan plan was an amendment to an apprenticeship trust fund and not administration of it where, in adopting the plan, "the trustees dictated that participants in the training program would no longer be able to accept employment with non-contributing employers without incurring a repayment obligation" because "[t]his constituted a substantive change to the terms of the Trust Fund's apprenticeship program"); *Hartline v.*

*Sheet Metal Workers' National Pension Fund*, 286 F.3d 598 (D.C. Cir. 2002) (*per curiam*) (finding that setting of nonuniform contribution rates in a multi-employer pension fund was not a fiduciary function).

¶ 147    In the case at bar, the Health Trust Board was explicitly given the discretion to provide different contribution levels for retirees, dependents, and survivors, as long as the total contribution did not exceed 45% of the total cost of the benefits. 40 ILCS 5/22-101B(b)(5) (West 2008). By making the choice to charge the maximum 45%, the Health Trust Board was not amending or modifying the plan itself, but was exercising discretion that was specifically given to it. Accordingly, we find that the Health Trust Board was acting as a fiduciary in setting the contribution levels for plaintiffs, as was the Retirement Plan Board when it withheld the funds from the retired CTA employees' pension checks.

¶ 148    We next consider whether plaintiffs have alleged that the Health Trust Board and the Retirement Plan Board breached their fiduciary duties. As noted, under the Pension Code:

"A fiduciary with respect to a retirement system or pension fund established under this Code shall discharge his or her duties with respect to the retirement system or pension fund solely in the interest of the participants and beneficiaries and:

(a) For the exclusive purpose of:

(1) Providing benefits to participants and their beneficiaries; and

(2) Defraying reasonable expenses of administering the retirement system or pension fund;

(b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims;

(c) By diversifying the investments of the retirement system or pension fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(d) In accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund." 40 ILCS 5/1-109 (West 2008).

¶ 149    Plaintiffs claim that the defendant Boards were not acting "solely in the interest of the participants and beneficiaries" (40 ILCS 5/1-109 (West 2008)) when they increased the retiree contribution and withheld the funds from the retired CTA employees' pension checks. "A plan administrator's duty to act in the best interest of all the beneficiaries cannot mean that it must cater to the optimal needs of each individual beneficiary. All of the beneficiaries' interests will not always be aligned. The fiduciary must act as though it were a reasonably prudent businessperson with the interests of all the beneficiaries at heart." *Ameritech Benefit Plan Committee v. Communication Workers of America*, 220 F.3d 814, 825 (7th Cir. 2000). In the case at bar, while plaintiffs claim that the defendant Boards were not acting in plaintiffs' best interests, plaintiffs were not the only beneficiaries under the retirement plan agreement. Given the precarious state of the funding of the Retirement Plan, we cannot find that plaintiffs have stated a claim that the defendant Boards were not acting in the best interests of the beneficiaries and participants of the Retirement Plan as a whole, and therefore affirm the dismissal of their breach of fiduciary duty claims. We note that, in their reply brief, plaintiffs argue that "whether [the defendant Boards'] actions were in the interest of any participant at all is a fact question that cannot be decided on a motion to dismiss." However, plaintiffs do

not allege anywhere in their complaint that any of the defendant Boards' actions adversely impacted any beneficiaries other than themselves and it is difficult to see how reducing the amount of money the Retirement Plan is forced to spend on plaintiffs could adversely affect the other beneficiaries. Accordingly, as noted, we affirm the dismissal of plaintiffs' breach of fiduciary duty counts.

¶ 150                               E. Declaratory Judgment

¶ 151    Finally, we consider whether plaintiffs stated a cause of action for declaratory judgment. "The essential requirements of a declaratory judgment action are: (1) a plaintiff with a legal tangible interest; (2) a defendant having an opposing interest; and (3) an actual controversy between the parties concerning such interests." *Beahringer v. Page*, 204 Ill. 2d 363, 372 (2003) (citing *Griffin v. County of Cook*, 369 Ill. 380, 398 (1938) (Stone, J., specially concurring, joined by Farthing, J.)). "A declaratory judgment 'may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well.' " *Beahringer*, 204 Ill. 2d at 372 (quoting 735 ILCS 5/2-701(b) (West 2000)). A declaratory judgment is strictly remedial and does not create substantive rights or duties, but "merely affords a new, additional, and cumulative procedural method for the judicial determination of the parties' rights." *Beahringer*, 204 Ill. 2d at 373 (citing *Berk v. County of Will*, 34 Ill. 2d 588, 591 (1966)).

¶ 152    In the case at bar, defendants argue that plaintiffs fail to state a claim for declaratory judgment because "Plaintiffs' request for declaratory relief hinges on Plaintiffs' preceding eight counts and does not allege any independent legal interest sufficient to state a claim for declaratory relief." We do not find defendants' argument persuasive. Defendants fail to recognize that a declaratory judgment action is "a new, additional, and cumulative procedural method for the judicial determination of the parties' rights." *Beahringer*, 204 Ill. 2d at 373 (citing *Berk*, 34 Ill. 2d at 591). Thus, " '[b]ecause the declaratory judgment procedure does not replace but merely adds to existing remedies a form of judgment to declare the rights of the parties, the existence of other remedies does not preclude judgment for declaratory relief, even though such other remedies may be equally effective.' " *Beahringer*, 204 Ill. 2d at 374 (quoting Ill. Ann. Stat., ch. 110, ¶ 2-701, Historical and Practice Notes, at 6-7 (Smith-Hurd 1983)). Moreover, we do not find defendants' reliance on *Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill. App. 3d 434 (2011), to be persuasive. There, the declaratory judgment claim was dismissed because it was duplicative of other claims in the complaint *that were properly dismissed*. *Seip*, 408 Ill. App. 3d at 447. Thus, there was no controversy, since the court had already determined that those claims were meritless. Here, by contrast, we have determined that several of plaintiffs' claims should have survived defendants' motions to dismiss. Since the claims are still viable, we cannot agree with defendants that the declaratory judgment claim should have been dismissed.

¶ 153                                    CONCLUSION

¶ 154    For the reasons set forth above, we find: (1) the trial court properly found that current CTA employees did not have standing to bring their claims and properly dismissed their claims; (2) retired CTA employees have a vested right to at least some portion of their retiree health benefits; (3) retired CTA employees stated a cause of action for breach of contract against the Retirement Plan but did not state a cause of action against the CTA; (4) retired

CTA employees stated a cause of action for promissory estoppel against the CTA but did not state a cause of action against the Retirement Plan; (5) retired CTA employees did not state a cause of action against the Retirement Plan Board and the Health Trust Board for breach of fiduciary duty; and (6) retired CTA employees stated a cause of action against all defendants for declaratory judgment. We also reverse the dismissal of the retired CTA employees' constitutional claim and order the trial court to consider the claim in light of the forthcoming decision of the Illinois Supreme Court.

¶ 155        Affirmed in part and reversed in part; cause remanded with instructions.